1
2
3

LAMKIN IP DEFENSE
Rachael D. Lamkin (246066)
One Harbor Drive, Ste. 304
Sausalito, CA 94965
916.747.6091
RDL@LamkinIPDefense.com

4
5

*Attorneys for DJ Plaintiff*
*Cristine Melo*

6

7

## UNITED STATES DISTRICT COURT

8

## NORTHERN DISTRICT OF CALIFORNIA

9

10

CRISTINE MELO

11

Plaintiff,

12

v.

13

14
15
16

FRIDA KAHLO CORPORATION, a
Panamanian corporation, and FRIDA
KAHLO INVESTMENTS, S.A., a
Panamanian corporation,

17

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.  3:19-cv-05449-CRB

**PLAINTIFF'S SECOND AMENDED
DECLARATORY JUDGMENT
COMPLAINT FOR (1) NON-
INFRINGEMENT (FIRST
AMENDMENT); (2) NON-
INFRINGEMENT; (3) NOMINATIVE
FAIR USE; (4) CANCELATION DUE
TO NAKED ASSIGNMENT; (5)
CANCELATION DUE TO FRAUD; (6)
INTENTIONAL INTERFERENCE
WITH PROSPECTIVE BUSINESS
ADVANTAGE; (7-8) UNLAWFUL AND
UNFAIR COMPETITION; and (9)
CANCELATION DUE TO
ABANDONEMENT.**

18
19
20
21
22

## SECOND AMENDED DECLARATORY JUDGMENT COMPLAINT

23

24

25
26
27

        By and through her undersigned counsel, Declaratory Judgment Plaintiff Cristine Melo
respectfully files this Second Amended Complaint against the Frida Kahlo Corporation and Frida
Kahlo Investments in order to stop Defendants' improper trademark allegations aimed at
preventing artists from creating homages in the name and image of Frida Kahlo.

28

**NATURE OF THE ACTION**

1.　　This is an action for declaratory judgment of non-infringement and cancelation arising under the trademark laws of the United States, 15 U.S.C. §§ 1051 *et seq*., and for California state law claims for: (1) intentional interference with prospective business advantage; and (2) unlawful and unfair trade practices.  Plaintiff Cristine Melo also seeks attorney's fees pursuant to Section 35 of the Lanham Act, *Octane Fitness, LLC v. ICON Health & Fitness, Inc*., 572 U.S. 545, 134 S. Ct. 1749 (2014), 28 U.S.C. §1927, and California's Private Attorney General Statute.

**THE PARTIES**

2.　　Declaratory Judgment Plaintiff Cristine Melo is a Brazilian artist who paints portraits of the famed Mexican painter Frida Kahlo, and has been doing so for nearly two decades, long before trademarks of any kind were filed for FRIDA KAHLO by any person or entity, and long before the formation of Defendants Frida Kahlo Corporation and Frida Kahlo Investments. Ms. Melo lives in this District.

3.　　Declaratory Judgment Defendants the Frida Kahlo Corporation and Kahlo Investments, S.A. ("FKC") are Panamanian Corporations, each with a principal place of business in Florida.[1]   In violation of the Lanham Act, the First Amendment, and the Fair Use Doctrine, FKC has engaged in a mass campaign to stop artists from creating homages in the name and image of Frida Kahlo, to remove Frida Kahlo from the public domain, and to eliminate and/or monetize all expressive works referencing Frida Kahlo.

**JURISDICTION AND VENUE**

4.　　This Complaint arises under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*. based on FKC's improper service upon artist platforms, such as eBay, Etsy, Zazzle,

---

[1] FKC will be referred to in the singular for readability.

and Redbubble, multiple intellectual property takedowns of Ms. Melo's artwork thereby giving rise to an actual case or controversy under 28 U.S.C. §§ 2201 and 2202.

5.     This Court has supplemental jurisdiction over Ms. Melo's state law claims pursuant to 28 U.S.C. §§ 1338 and 1367.

6.     This Court has jurisdiction to determine the right to registration and to order cancelation of a registration pursuant to 15 U.S.C. § 1119.

7.     This Court has specific jurisdiction over FKC.  FKC has repeatedly reached into California to take advantage of its companies and laws.  FKC has repeatedly relied upon California companies to enforce its intellectual property.  Zazzle, for example, has been enforcing FKC's trademark registrations for a decade.  FKC, either directly or through its agents, have effected thousands of improper takedowns through platforms in this District.

8.     FKC has intentionally circumvented the court system by using California companies to improperly enforce FKC's limited trademark rights beyond their actual boundaries. As to Ms. Melo alone, over the past eight (8) years FKC has sent multiple takedown notices to platforms such as Redbubble and Etsy, both in San Francisco, and Zazzle, in Redwood City, in order to effectuate removal of the artwork of Ms. Melo, also a resident of this district.

9.     FKC has a contractual relationship with Zazzle in order to monetize and improperly monopolize artistic works referencing Frida Kahlo on Zazzle.com.  *See* https://www.zazzle.com/store/fkfanmerch/getstarted.  FKC's contract with Zazzle alone establishes jurisdiction.  (Additional jurisdictional facts are plead under each cause of action, below.)

10.     Venue is proper in this judicial district because a substantial part of the events giving rise to the claim occurred herein, including the harms and injuries to Ms. Melo and California residents, and FKC's improper contract/agreement with Zazzle.

**FACTUAL BACKGROUND**

11.     ___Frida Kahlo___ (1907 - 1954) is now regarded as one of the most significant artists of the twentieth century.  By 1984, Frida Kahlo's reputation as an artist had grown to such extent that Mexico declared her works to be National Cultural Heritage, prohibiting their export from the country.

12.     As a result, her paintings seldom appear in international auctions and comprehensive retrospectives are rare.  Regardless, her paintings have still broken records for Latin American art at auction.  In addition to her acknowledged, critically important art, Frida Kahlo is an iconic figure to many communities, including the Latin, communist, feminist, human beings with disabilities, and gay communities world-wide.

13.     Frida Kahlo died intestate in Mexico in 1954.  To the extent that California would recognize the publicity rights of Mexico, any publicity rights in the name and image of Frida Kahlo expired fifty (50) years after her death, in 2004.

14.     Frida Kahlo has attracted such immense popular interest that the term "Fridamania" has been coined to describe the phenomenon.  Material to this case, she is considered one of the most instantly recognizable artists world-wide.

15.     Throughout her incomparable life, Frida Kahlo was known to favor and support the artwork and craft of local artisans.

16.     ___Plaintiff Cristine Melo___ is an American portrait artist of Brazilian birth who has painted portraits of Frida Kahlo since 2001, long before the formation of FKC and long before any entity attempted to register the name "Frida Kahlo" as a trademark in any class.

[remainder of page intentionally blank]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

17.     An example of Ms. Melo's portraiture of Frida Kahlo:



18.     Ms. Melo has been selling her portraits of Frida Kahlo on eBay since 2001, on Etsy since 2005, Zazzle since 2009, and Redbubble since 2015.  Ms. Melo supports herself completely from the sale of her artwork.

19.     ***The Frida Kahlo Corporation*** (FKC) is a Panamanian Corporation owned in whole or in part by Carlos Dorado.

20.     Dorado admits that he used his skills "as a used car salesman," to con the family of Frida Kahlo into letting him commercialize the artist.

21.     According to documents filed with the USPTO, it appears that, on May 25, 2007, the grandniece of Frida Kahlo assigned trademark's to FKC, including six registered US

18
19
20
21
22
23
24
25
26
27
28

trademarks and three pending US trademarks.  Since then, three of those marks have been

abandoned and, as described below, others were secured or maintained by fraud.

   22. Even though the Kahlo Family assigned a limited number of trademarks—and no

other rights—to FKC, FKC represents that it holds all rights world-wide to FRIDA KAHLO:

frida kahlo corporation owns the trademark rights and
interests to the name frida kahlo worldwide



https://fridakahlocorporation.com

   23. But FKC's representations are false.

### FKC's Abusive, Illegal Takedown Procedures

   24. FKC owns about a dozen United States trademark registrations for "Frida Kahlo"

covering goods such as tequila, cigars, and coffee.

   25. FKC owns no US registrations for "Frida," and no US registrations for "Kahlo".

   26. FKC has no rights to Frida Kahlo's image.

   27. Yet, FKC tells platforms to remove any mention of "Frida" or "Kahlo" or "Frida

Kahlo" for every single product offering on platforms.

   28. For example, Ms. Melo sells her paintings of Frida Kahlo on eBay and offers

digitized versions of her fine art portraits on Print on Demand ("POD") sites such as Zazzle and

Redbubble.  On those sites a consumer can select Ms. Melo's portrait and place said portrait on an

iPhone case, for example.

   29. Ms. Melo's work cannot infringe any of FKC's alleged trademark registrations.

   30. The name Frida Kahlo never appears on the cell phone case, Ms. Melo's name

does:



31.   And FKC has no US registrations for cell phone cases.

32.   And FKC has no US registrations for Frida.

33.   And even if none of the above were true, identifying the subject of her paintings in the metatags and title of her works is not "brand identifying," as FKC has itself admitted.

34.   FKC's conduct is not limited to Ms. Melo.  FKC tells the platforms that any use of "Frida [product]" or "Kahlo [product]" or "Frida Kahlo [product]" must be removed regardless of whether the use is brand identifying, regardless of whether FKC owns a mark for the product at-issue.

35.   **_Red Points_** is FKC's authorized agent for the enforcement of FKC's trademarks.

36.     It appears that FKC hired Red Points in or around 2017.  Prior to that date, FKC executed its trademark enforcement internally or through traditional trademark counsel.

37.     Red Points is incorporated in Delaware, with offices in New York, New York, Salt Lake City, Utah, and Barcelona, Spain.

38.     When Red Points submits takedown notices to platforms, Red Points tells the platform, "We contact you on behalf of our client Frida Kahlo Corporation, in our capacity as authorized agents[.]"

39.     In its takedown submissions, Red Points tells the platforms, "We swear, under penalty of perjury, that the information in this notification is accurate and that we are authorized to act on behalf of the owner whose exclusive rights have been allegedly infringed."

40.     Red Points' email address for its FKC enforcement is fridakahlo-bp@redpoints.com

41.     Red Points has submitted thousands of takedown notices to Redbubble alone, expressly telling that platform that it is acting as FKC's "authorized agent".

42.     Red Points has submitted thousands of takedown notices to Etsy, telling Etsy that Red Points is FKC's "Authorized Enforcement Agent".

43.     According to Red Points' CEO, "Red Points and the Frida Kahlo Corporation" worked together to set up parameters to police the use of the Frida Kahlo Corporation's trademarks for several goods" across platforms such as "e-Bay [*sic*], Redbubble, Etsy, Amazon, and others."

44.     On September 9, 2019, counsel for FKC informed counsel for Ms. Melo, "FKC uses Red Points, in Europe, to monitor online violations of its intellectual property rights. Our understanding is that Red Points, in turn, identifies potential infringing products based on the results of its automated processes, and ***after client review*** initiates takedown notices to online platforms." (emphasis added.)

45.     ***Frida Kahlo's Family (the "Kahlo Family")***.  When Frida Kahlo died without a

will in 1954, her publicity rights passed to her closest living relative, Isolda Kahlo, the daughter of Frida's sister Cristina (*i.e.,* Frida Kahlo's niece).

46.     It appears that Isolda did nothing to protect or preserve any publicity or trademark rights in Frida Kahlo for nearly fifty (50) years, until 2002, when Selma Hayek's Frida Kahlo biopic was released.

47.     During those near fifty (50) years artists, like Rupert Garcia, *infra*, created acclaimed works in the name and image of Frida Kahlo, including portraits.

48.     But shortly after the release of the Frida Kahlo movie, Isolda began filing "intent to use" trademark applications.

49.     They were "intent to use" because until Hayek's Frida Kahlo movie in 2002, the family appears to have had no intention to remove Frida Kahlo from the public domain.

50.     Even though Isolda filed trademark applications, it appears she created no products bearing the Frida Kahlo name until her partnership with FKC.

51.     As for FKC, according to the Kahlo Family, "We entered into a partnership with [FKC], we never sold them our rights.  The agreement with the Corporation was that [the family] would provide the brand name, while [FKC] would provide the resources and the know-how."

52.     But, according to the family, FKC was and is a rogue partner, neither communicating with the family, nor following the family's wishes.

53.     And all the while, the public continued to create in honor of Frida Kahlo.

54.     For example, FKC attempted to seize FridaKahlo.com from a third party in 2010 but lost that litigation because the owner of that site, dedicated to the life and work of Frida Kahlo, started said website in 1985, seventeen years (17) before the first Frida Kahlo trademark application was filed, nineteen (19) years before FKC was formed:

https://www.adrforum.com/domaindecisions/1340890.htm

55.     Additional websites devoted solely to Frida Kahlo (and employing "Frida Kahlo" in the domain name), owned by **neither** FKC nor the Kahlo Family include:

a.  www.FridaKahlo.org

b.  https://www.frida-kahlo-foundation.org

c.  http://www.fridakahlo.it

d.  https://www.fridakahlofans.com

e.  https://www.museofridakahlo.org.mx/en

f.  https://www.fridafashions.com

To name but a handful.

56.     After Frida Kahlo's death and decades before either the Kahlo Family or FKC began attempting to remove Frida Kahlo from the public domain, artists and merchants created art and homages, of the highest caliber to bric-a-brac, in Frida Kahlo's name.

57.     Regardless, FKC's relationship with the Kahlo Family deteriorated quickly.   The limited assignment was signed in 2007, and according to FKC, by 2011, the Family had become "disaffected with FKC".

58.     On April 18, 2018, the Kahlo Family published on their Frida Kahlo Facebook page, an open letter to the public claiming, *inter alia*, that a court in Mexico has issued a decree that FKC cannot use the brand, image, and work of Frida Kahlo without consent of the family.

59.     The letter also goes on to state that FKC is to refrain from, "any act tending to commercialize products that have the brand and image of Frida Kahlo."

60.     The Kahlo Family runs the social media accounts honoring Frida Kahlo.

a.  https://twitter.com/FridaKahlo

b.  https://www.instagram.com/fridakahlo/

c.  https://www.facebook.com/fridakahlo/

61.   **_Rupert Garcia_** is a renowned San Francisco artist, art teacher, and activist who has been painting portraits of Frida Kahlo since, at least, 1975.[2]  *See*:



Homenaje a Frida Kahlo. Original Artwork, Rupert Garcia.

[remainder of page intentionally left blank]

[2] https://americanart.si.edu/artist/rupert-garcia-1732



62.     Garcia painted and still paints at San Francisco's La Raza Gallery (Galería de la Raza), where, in the 70's, Latina feminists are credited as first placing Frida Kahlo into the political and cultural discourse.

[remainder of the page intentionally blank]

63.     Portraits of Frida Kahlo have played a role in US/Mexico relations.  For example, in 2001, the United States and Mexico co-released a Frida Kahlo postage stamp, created by the artist Armando Delgado:



64.     The Frida Kahlo stamp is still considered one of the most controversial stamps in history because of Ms. Kahlo's various identities and communist alignments.   One writer commented his outrage in the Wall Street Journal thusly, "Not only was Kahlo Hispanic and female — she was bisexual and handicapped, too."

65.     Portraits of Frida Kahlo are part of the fabric of our political and social discourse, and have been for years before the formation of FKC.

### COUNT I:

### NON-INFRINGEMENT OF AN ARTISTIC WORK

### (THE FIRST AMENDMENT PROTECTS MS. MELO'S ESPRESSIVE WORKS)

66.     Paragraphs 1-65 are incorporated by reference herein.

67.     The First Amendment protects expressive and artistic works from trademark

infringement allegations.

68.     The Lanham Act is construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression.

69.     Consumers expect a title of a book or the subject of a painting to communicate a message about the book or painting, but they do not expect it to identify the publisher or manufacturer.

70.     The name of a painting does not violate the Lanham Act unless the name has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.  Here, neither concern applies.

71.     Clearly the name "Frida Kahlo" has artistic relevance to the artistic work comprising a painting depicting Frida Kahlo.

72.     And the name "Frida Kahlo" does not explicitly mislead as to the source; instead it simply and accurately identifies the historical figure depicted in the painting.

73.     Further, the First Amendment protects Ms. Melo's artwork on cell phone cases, for example, to the same extent that it protects her work on canvas.

74.     Borrowing language from the California Supreme Court, "[Frida Kahlo's] likeness appears in the [phone cases] for precisely the same reason [it] appears on the original [painting]."

75.     The First Amendment protects Ms. Melo's right to use the name "Frida Kahlo" to describe her expressive and artistic works honoring Frida Kahlo.

## COUNT II: NON-INFRINGEMENT

### (not brand identifying use)

76.     Paragraphs 1-75 are incorporated by reference herein.

77.     Ms. Melo paints portraits of Frida Kahlo and identifies the subject of the portraits and either "Frida" or "Frida Kahlo".

78.     FKC issued takedowns for portraits of Frida Kahlo merely identified as "Frida," for example:

**More information:**

**Rights holder:** Frida Kahlo Corporation

**Subject matter:** Frida Kahlo trademark

**Affected Artwork:**

 Frida's Blues
https://www.redbubble.com/people/meloearth/works/15642634-fridas-blues

 Happy Frida
https://www.redbubble.com/people/meloearth/works/22492692-happy-frida

 Frida's Heart
https://www.redbubble.com/people/meloearth/works/28514027-fridas-heart

79.     FKC does not own rights in the name "Frida" alone.

80.     FKC does not own rights in Frida Kahlo's image.

81.     As detailed below, FKC used *a Chinese trademark registration* to remove Ms. Melo's artwork from Redbubble.   It's clear from the URL that the domain name is a United States domain.

82.     If the domain was outside the country, for example Australia, the URL would so indicate:

https://www.etsy.com/au/listing/532479396/small-frida-kahlo-pin

83.     Frida Kahlo's publicity rights expired in 2004 (assuming *arguendo*, California

recognizes Mexico's publicity rights law.  If not, they expired in 1954).

84.     And any alleged rights in the full name "Frida Kahlo" would not be infringed by Ms. Melo's use here, as FKC has admitted.

## COUNT III:

## NOMINATIVE FAIR USE

85.     Paragraphs 1-83 are incorporated by reference herein.

86.     Paintings depicting Frida Kahlo would not be readily identifiable and/or locatable without use of the descriptor "Frida Kahlo".  Further, Ms. Melo would be at a competitive disadvantage if she described her work in any other manner, for example adding additional words in the metatags (e.g., "inspired by").  Each of the platforms limit the number of terms (characters) that can be used and the platforms advise the artists that short titles and search terms are required.

87.     Ms. Melo used only so much of the mark as was reasonably necessary to find and/or identify her paintings.

88.     Ms. Melo did nothing that would suggest sponsorship or endorsement by FKC.

[remainder of the page intentionally blank]

89.     For example, her portraits make clear she is the artist, using both her last name (Melo) and her site name (Meloearth) on her portraits:



90.     Ms. Melo's paintings depicting Frida Kahlo cannot infringe FKC's purported "Frida Kahlo" registration under the nominative fair use doctrine.

## COUNT IV:

## CANCELATION DUE TO NAKED ASSIGNMENT

## (15 U.S.C. § 1060(a)(l))

91.     Paragraphs 1-90 are incorporated by reference herein.

92.     A trademark registration symbolizes the public's confidence or goodwill in a particular product.  A trademark registration is no more than that; it is insignificant if separated from that confidence.  Therefore, a trademark is not the subject of property except in connection with the transfer of goodwill.

93.     In 2007, Isolda's daughter, ostensibly acting as Isolda's guardian, assigned an enumerated number of trademark applications and registrations to FKC.

94.     The assignment amounts to a naked or "in gross" assignment as it fails to transfer goodwill, both under the express terms of the agreement and as evidenced by the conduct of the parties to the assignment.

95.     It appears that the Kahlo Family had no control over the quality or character of the products affixed with Frida Kahlo.

96.     For example, the Kahlo Family has stated they were not consulted in Mattel's Frida Kahlo Barbie doll and that they "would have liked the doll to have traits more like Frida's, not this doll with light-colored eyes," Romeo said at the time. "I would have liked her to have a unibrow, for her clothes to be made by Mexican artisans."

97.     Indeed, Mattel's Frida Kahlo Barbie, ostensibly designed in collaboration with FKC, bears little resemblance to the doll created by the family and used as a Specimen in the doll trademark prosecution.

98.     The stark contrast between the doll designed by the Family and the Mattel Frida Kahlo Barbie is evidence of a lack of transferred goodwill, among other evidence to be disclosed.

99.     Each of the trademark registrations and applications in the 2007 assignment, and all assignments depending thereupon, must be canceled as part of an in gross assignment.

## COUNT V:

## CANCELATION DUE TO FRAUD (15 U.S.C. § 1064(3))

100.    Paragraphs 1-99 are incorporated by reference herein.

101.    FKC purports to hold a registration in International Classification 16, which includes art: Registration No. 3318902 (the '902 Registration).

102.    Frida Kahlo's niece Isolda Pinedo Kahlo first filed an intent-to-use application in 2002 for FRIDA KAHLO for books.

103.    Ms. Pinedo Kahlo filed Statement of Use extensions for three years, until 2007, when she filed a Specimen for a notebook.

104.    That was the only Specimen ever filed in support of the '902 Registration by Ms. Pinedo Kahlo.

105.    On 10/23/2007, Ms. Pinedo Kahlo received a registration on the Principal Register for FRIDA KAHLO for the category of goods listed, including books, art, and notebooks.

106.    In January 2011, FKC filed an assignment of the '902 Registration with the USPTO.

107.    On 10/23/2012, FKC's attorney David Farber submitted a Combined Declaration of Use and Incontestability under Sections 8 & 15 to the USPTO.

108.    With this submission, FKC's representative Beatriz Alvarado submitted a declaration that stated that all of the goods listed were being used by FKC and that all of the goods listed had been in continuous use in commerce for five (5) consecutive years.

109.    These statements appear to be fraudulent.

110.    Ms. Alvarado also signed a declaration stating that she understood that willful false statements could invalid the '902 Registration.

111.    Ms. Alvarado and FKC's "evidence" of use appears to be willfully false.

112.    Specimen number one contains pictures of Frida Kahlo's own artwork.



113.    Frida Kahlo's own artwork, painted more than sixty (60) years prior, cannot evidence continuous use in commerce by FKC from 2007 to 2012.

114.    The submission of photographs of Frida Kahlo's own artwork in an attempt to satisfy FKC's proof of use in commerce for artwork is so specious that a reasonable factfinder could conclude that it was submitted with a knowing intent to defraud the USPTO.

115.    Specimen number two is a book written, in Spanish, by Isola Pinedo Kahlo and, upon information and belief, was not sold in the United States from 2007 to 2012, and not by FKC.

116.    Specimen number two does not evidence continuous use in commerce by FKC from 2007 to 2012.

117.    Specimen number three seems to suggest that Ms. Pinedo Kahlo took a license from FKC for her own book.  This is unlikely.

118.    Specimen number four appears to be notebooks of the type sold in Mexico and likely does not evidence use in commerce in the United States by FKC.

119.    Specimen number five is a screenshot of a PBS (Public Broadcasting Station)

special about Frida Kahlo and does not evidence use in commerce by FKC.

120.    The PBS posting is from March 2005 and is about a film by third parties having nothing to do with FKC.

121.    No reasonable trademark practitioner could believe that PBS' website evidences use in commerce by FKC from 2007 to 2012.

122.    Specimen number six contains pictures of Frida Kahlo, taken during her lifetime, and not by FKC.

    a.   Some were taken by Frida Kahlo's father ***nearly a century ago***.

    b.   Some were taken by famous photographers such as Nickolas Muray.

    c.   The Muray estate has not given FKC permission to use his photographs.

123.    No reasonable trademark practitioner could believe that portraits taken of Frida Kahlo, taken by third parties, decades before the formation of FKC, could evidence continuous use in commerce by FKC from 2007 to 2012.

124.    The specimen submissions are completely without factual and legal basis such that no reasonable trademark practitioner could have submitted them unless fraud was the intent.

## COUNT VI:

## INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

125.    Paragraphs 1-124 and 213-244 are incorporated by reference herein.

126.    ***Platforms***: art has been democratized in a sense with the internet.  Artists can now sell their own art directly to the public, though mediated by online platforms such as eBay, Etsy, Redbubble, and Zazzle, to name a handful of examples relevant here.

127.    An entity like FKC can submit thousands of improper takedowns with little recourse or fear of reprisal given the one-sided nature of platform enforcement.

### REDBUBBLE

128.    Redbubble is a platform for artists to sell their work, at https://www.redbubble.com.

129.    Redbubble was started to "give independent artists a meaningful new way to sell their creations."

130.    Redbubble has a principal place of business in San Francisco, California.

131.    FKC on its own and through its agent Red Points submits thousands of takedown notices to Redbubble.

132.    After a takedown, if an artist wants to provide a counternotice demonstrating non-infringement, "such counter-notice must provide . . . a statement by [the artist] that [she] consents to the jurisdiction of the Federal District Court, San Francisco County, California, United States and that [she] will accept service of process from the person who provided notification described above or an agent of such person[.]"

133.    Redbubble explains, "In many circumstances, however, we will forward your counter notice directly to the complainant, which will include your personal contact information. At that time the complainant may take legal court action against you in the United States. If after 14 days the complainant has not taken legal action against you, you may contact us to request that we reinstate your work. If your work otherwise complies with our User Agreement and IP/Publicity Rights Policy, we may reinstate your work at that time."

134.    In other words, if an artist wants to demonstrate non-infringement, she must submit to the jurisdiction of this district, regardless of where she lives, and she will have her address and communications sent directly to FKC in order to face costly litigation.  This is a Hobbesian choice.

135.    Further when FKC submits a takedown notice to Redbubble, Redbubble does not provide the submitted intellectual property to the artist, making the drafting of a legitimate counter-notice all but impossible.

136.    ***Redbubble's Repeat Infringer Policy***: "It is Redbubble's policy, in appropriate

circumstances, to disable and/or terminate the accounts of users who repeatedly infringe or are repeatedly charged with infringing the copyrights, trademark rights, other intellectual property rights or publicity rights of others."

137.    In other words, FKC's repeated takedown notices to platforms such as Redbubble have the very real risk of resulting in Ms. Melo's entire art storefront being disabled.

138.    Redbubble will remove an artist's work and reserves the right to cancel the artists entire account if said artists receives multiple complaints.  Even if, like Ms. Melo, their work does not actually infringe any alleged trademark rights.

### *Redbubble Takedown Timeline*

139.    On May 6, 2019, FKC, through its agent Red Points, submitted three takedown notices for Ms. Melo's portraits, titled "Happy Frida" (depicting a smiling Frida Kahlo), "Frida's Blues" (depicting a sad Frida Kahlo), and "Frida's Heart" (depicting Frida Kahlo in a heart-shaped dress).

140.    FKC has no issued US trademarks for "Frida" alone.

141.    Indeed, the USPTO has rejected FKC's attempts to trademark "Frida" alone over and over again:

   a.  Rejected in class 16, paper goods (stationary);

   b.  Rejected in class 18, leather goods;

   c.  Rejected in class 25, clothing; and

   d.  Rejected in class 35, online retail.

142.    Regardless, in support of these takedown notices to Redbubble, **FKC submitted a Chinese trademark registration for "Frida Kahlo" in Chinese**, which is not enforceable in the

United States.[3]

143.   The May 6, 2019 takedown is emblematic of FKC's conduct.   FKC, through its agent Red Points submitted, on that single day, hundreds of takedown notices, removing artists' portraits of Frida Kahlo.  The work removed was simply Frida Kahlo portraits "on canvas," *i.e.*, art prints of portraits of Frida Kahlo.   And the rights asserted were not rights recognized in the United States.

144.   On August 23, 2019, FKC, through its agent Red Points, submitted a takedown notice for Ms. Melo's portrait titled "Amber Frida," depicting Frida Kahlo in the shade of amber.

145.   Again, FKC has no issued US trademarks for "Frida" alone.  Instead, in support of these takedown notices, **FKC submitted a European trademark registration for "Frida Kahlo**," which is not enforceable in the United States.

146.   Ms. Melo filed her original Complaint four (4) days later, on August 29, 2019.

147.   The next day, on August 30, 2019, FKC, through its agent Red Points, submitted a takedown notice for Ms. Melo's portrait titled "Frida in Her Garden," depicting Frida Kahlo in her Garden.

148.   FKC submitted, again, a European trademark for "Frida Kahlo".

149.   On September 1, 2019, counsel for Ms. Melo contacted FKC and demanded FKC reinstate Ms. Melo's artwork on Redbubble or face a motion for preliminary injunction.

150.   On September 2, 2019, counsel for Ms. Melo wrote to counsel for FKC and said that she would wait a week to file the injunction in light of the hurricane in Florida as a professional courtesy.

---

[3] Ms. Melo was able to obtain copies of the actual trademark registrations submitted by FKC/Redbubble through a Rule 45 request to Redbubble; Ms. Melo—like any artist—never actually sees the intellectual property submitted to Redbubble by alleged rights holders.

151.    On September 9, 2019, counsel for FKC wrote counsel for Ms. Melo and stated, "Unfortunately, the takedown of the above items occurred through a mistake, **as none of the above items use 'Frida' as a brand name,** which would infringe our client's 'Frida' mark." (emphasis added.)

152.    FKC continued, "Since May of 2019, our client has narrowed its search criteria used by Red Points to identify infringing online products. We believe that such mistakes will be prevented in the future because of the revised search criteria. Our client has also informed Red Points and Redbubble of the mistake related to the above items, and has requested that Redbubble reinstate the same."

153.    On September 17, 2019, Red Points wrote directly to Redbubble: "We would like to withdraw our complaint regarding the following content, which Red Points submitted on behalf of our client Frida Kahlo Corp. (https://fridakahlocorporation.com/), as Frida Kahlo Corp. now believes they directed Red Points to remove this material in error:  [Amber Frida]."

154.    On October 4, 2019, FKC, through its agent Red Points, submitted a takedown notice for Ms. Melo's portrait titled "Frida Kahlo Heartfelt Woman," again, depicting Frida Kahlo in a heart-shaped dress.   And, again, FKC submitted a European trademark for "Frida Kahlo," which is not enforceable in the United States.  The product listing removed was for a cell phone case, for which FKC has no US registrations.

155.    In each of the instances above, the Redbubble website accessed was the US Redbubble site.

156.    The actual takedown of Ms. Melo's "Frida Kahlo Heartfelt Woman" from the October 4 submission to Redbubble occurred on October 10, 2019.

157.    On October 11, 2019, counsel for Ms. Melo wrote counsel for FKC and again threatened an injunction if the takedowns did not cease.

158.    On October 14, 2019, counsel for FKC responded that the items should have been reinstated over the weekend.

159.    On October 16, 2019, Red Points sent Ms. Melo correspondence stating that she would receive no more takedown notices.

160.    On October 24, 2019, FKC, through its agent Red Points, submitted four (4) takedown notices: (1) again, for Ms. Melo's portrait titled "Frida Kahlo Heartfelt Woman," again, depicting Frida Kahlo in a heart-shaped dress; (2) "Frida Kahlo Starting Over," depicting Frida Kahlo with doves on her shoulders;[4] (3) "Frida Kahlo Bird Lady," depicting Frida Kahlo with birds [doves] on her shoulders; and (4) "Frida Kahlo & Blue Tulips" depicting Frida Kahlo with blue tulips.

161.    FKC submitted to Redbubble a European trademark for "Frida Kahlo".

162.    These takedown notices took effect on October 30, 2019.

163.    On October 30, 2019, FKC filed a motion to dismiss, Dkt. No. 14, where it repeatedly admitted that FKC's pre-complaint takedowns were a "mistake," that Ms. Melo's descriptions of her artwork were "non-infringing" and were "no brand identifying use," and assuring "The takedowns resulted from an error, and were not intentional.  Nor did Defendants believe that any infringement had occurred."   And:

- "Defendants agree that Melo did not infringe on their trademarks relating to the five takedowns."

- "Defendants agreed that Melo's artwork did not infringe."

- "Defendants have agreed that Melo's artwork does not constitute unauthorized trademark use of Defendants' trademarks."

---

[4] The selection of doves is intentional as Frida Kahlo is oft-described as the "dove" in her marriage to Diego Rivera (the elephant and the dove).

164.    Ms. Melo filed her first motion for preliminary injunction, Dkt. No. 18, on November 5, 2019.

165.    On November 7, 2019, FKC's agent Red Points wrote to Redbubble and asked Redbubble to reinstate the last five (5) of Ms. Melo's artworks that were removed, stating "We would like to withdraw our complaint regarding the following content, which Red Points submitted on behalf of our client Frida Kahlo Corp. (https://fridakahlocorporation.com/), as Frida Kahlo Corp. now believes ***they directed Red Points*** to report this material ***in error***."  (emphasis added.)

166.    The artwork reported "in error" was:

– Frida Kahlo, Starting

Over: https://www.redbubble.com/people/meloearth/works/28262017-frida-kahlo-starting-over

– Frida Kahlo "Bird
Lady": https://www.redbubble.com/people/meloearth/works/30433181-frida-kahlo-bird-lady

– Frida Kahlo & Blue
Tulips: https://www.redbubble.com/people/meloearth/works/37818492-frida-kahlo-and-blue-tulips

– Frida Kahlo Heartful
Woman: https://www.redbubble.com/people/meloearth/works/38824359-frida-kahlo-heartful-woman

167.    On November 18, 2019, counsel for FKC wrote to Redbubble, "We have confirmed that there was an error with the online monitoring platform and are confident that the error has been resolved.  At this time, until further notice, please do not initiate any takedown notices that

would affect [Ms. Melo]."

168.     In an interview with NPR about this lawsuit, a representative of FKC admitted, "Sometimes, in the course of policing unauthorized use of FKC's trademarks, Red Points may accidentally capture **non-infringing use** of the Frida Kahlo brand by artists that are describing their artwork[.]" (emphasis added.)

### *FKC Harms Compounded on Redbubble*

169.     According to Redbubble's Assistant General Counsel, "[i]f a content owner like [FKC] provides notice that particular listings infringe their intellectual property or publicity rights, Redbubble promptly (*i.e.,* typically within one business day) removes those listings and notifies the third-party Seller who uploaded them. In accordance with that practice, Redbubble will also 'disable and/or terminate the accounts of users who repeatedly infringe or are repeatedly charged with infringing the copyrights, trademark rights, other intellectual property rights or publicity rights of others.'" (quoting Redbubble's Repeat Infringer Policy.)

170.     "In addition to enforcing the notice and takedown provisions of the IP/Publicity Rights Policy, for certain content owners, Redbubble's 13-person Marketplace Integrity Team (MPI Team) provides further assistance by proactively policing the Redbubble Marketplace for potentially infringing content, using screening criteria established by Redbubble, based on information from content owners, and almost always created in collaboration with those content owners." (Redbubble AGC in sworn declaration.)

[remainder of the page intentionally blank]

171.    FKC told Redbubble's legal department the following:

However, the following uses of the terms appear as source identifiers, and are infringing:

(1)  FRIDA KAHLO [ITEM], for example, Frida Kahlo t-shirt

(2)  FRIDA KAHLO ART [ITEM], for example, Frida Kahlo art t-shirt

(3)  FRIDA ART [ITEM]

(4)  FRIDA [ITEM]

(5)  KAHLO [ITEM]

(6)  KAHLO ART [ITEM]

172.    FKC's directives to the platforms misrepresent their rights.

173.    As noted, FKC has no US registrations for Frida alone, or Kahlo alone.

174.    And, the majority of FKC's US registrations for "Frida Kahlo" are for product categories that have nothing to do with either Ms. Melo's fine art portraits or the digitized versions of her fine art paintings selected by customers to be placed on products on POD sites such as Redbubble and Zazzle.

175.    For example, FKC has no US registrations for cell phone cases, watch bands, pillows, office supplies, and jewelry.

176.    Further, once FKC misrepresents its rights to platforms such as Redbubble, Redbubble's own internal policing system is triggered, resulting in the takedown and potential removal of countless innocent artists' work.

177.    Given that "Redbubble's proactive policing efforts to date have resulted in the disabling or removal of nearly 2,300,000 listings from the Redbubble Marketplace, covering approximately 66,700,000 products[,]" the effect on California artists and California consumers will be substantial.

**ZAZZLE**

178.    Zazzle is a Redwood City based company that allows artists to sell their artwork online as part of a print on demand (POD) service.

179.    Zazzle is in a contractual relationship with FKC.

180.    Zazzle's relationship with FKC started in 2010 when Carlos Dorado sent at least two letters to Zazzle, accusing Zazzle of infringing FKC's rights to the "name and image" of Frida Kahlo.

181.    FKC and Zazzle resolved their dispute with a settlement agreement wherein Zazzle agreed to enforce FKC's intellectual property, including taking down any product that used "Frida Kahlo" in either the product description or metatags (which is non-infringing in most contexts).

182.    This directive was irrespective of product category; *i.e.,* Dorado directed Zazzle to take down any art or listing, even if FKC had no US registrations for said listing.

183.    Zazzle has been enforcing FKC's purported rights for a decade.

184.    Recently, FKC has also instructed Zazzle, as it did Redbubble, that no artists may use the name "Frida [product]" or "Kahlo [product]" either, regardless of the product.

185.    In addition to making Zazzle its California IP enforcer for the last decade, Zazzle and FKC also created the Frida Kahlo FanMerch program.

186.    Under the FanMerch program, artists are forced into a 10% royalty (meaning the artist only earns 10% on any sale of her artwork).

187.    Outside of the Fanmerch program, artists can choose any royalty rate they desire.

188.    Ms. Melo sets her royalty rates at 30% to 70%, depending on the artwork and product.

189.    As of today, it appears that every independent artist selling work in honor of Frida Kahlo on Zazzle has been forced into the FanMerch program; *i.e.,* a consumer cannot buy work

honoring Frida Kahlo on Zazzle without paying Zazzle and FKC.

190.    For example, if you search "Frida Kahlo" on Zazzle's site, there appears to be about 2,000 items available, and it appears from a randomized review, that all of those products are offered "by Frida Kahlo" the Mexican artists or by artists in the FKC FanMerch program.

191.    Similarly, a search for "Frida" alone offers only FKC merch (with one exception found).

192.    Further, as to its own store on Zazzle, FKC tells the public that the art available on FKC's store is designed by Frida Kahlo.



https://www.zazzle.com/frida_kahlo_vintage_floral_otterbox_iphone_case-256067553283085685



https://www.zazzle.com/store/fridakahlo

193.    There is no ® displayed by the name Frida Kahlo.

194.    FKC is telling the public, including California residents, that the products on Zazzle at the Frida Kahlo Official Store are designed by the iconic Mexican painter, Frida Kahlo.

195.    And, FKC is forcing California artists into a program that mandates said artists

1   misrepresent their work and receive a lower royalty than generally charged.

2                        **Zazzle Takedown Timeline**

3       196.    On October 1, 2017, Zazzle removed Ms. Melo's portrait of Frida Kahlo titled,

4   "Frida Kahlo with Birds," an image of Frida Kahlo with birds on her shoulder.

5       197.    It is clear from Ms. Melo's Zazzle site that she is a resident of California.

6       198.    When Ms. Melo wrote to Zazzle explaining that her work did not infringe, Zazzle

7   suggested that Ms. Melo join the Frida Kahlo FanMerch program.

8
9       199.    Ms. Melo refused to join the program, believing the royalty requirements to be

10  improper and unsustainable.  Thus, she was no longer permitted to offer her portraits of Frida

11  Kahlo on Zazzle.

12      200.    In December 2019, given FKC's representations that FKC would cease taking down

13  her artwork, Ms. Melo again began offering her portraits of Frida Kahlo for sale on Zazzle.

14
15      201.    Immediately after Ms. Melo placed her portraits of Frida Kahlo on Zazzle, they

16  were removed.

17      202.    Zazzle removed Ms. Melo's artwork based on an internal program developed at

18  FKC's direction and as part of its contractual relationship with Zazzle.

19      203.    FKC has refused to reinstate Ms. Melo's work on Zazzle.

20      204.    Zazzle also has a Repeat Infringer Policy that could result in Ms. Melo's permanent

21  ban on Zazzle.

22
23      205.    In sum, Ms. Melo is in an economic relationship with platforms such as Zazzle,

24  Redbubble, and Etsy wherein Ms. Melo offers her artwork on the platforms, to be selected and

25  purchased by customers.

26      206.    Both Ms. Melo and the platforms receive a proportion of the monies paid to the

27  platforms for Ms Melo's artwork.

28

207.   FKC understands that Ms. Melo is in this economic relationship.  For example,

   a.   Ms. Melo offers her art on the Zazzle platform;

   b.   the URL's taken down by FKC contain both Ms. Melo's name and the platform's name; and

   c.   the entire purpose of FKC's takedown notices is to remove said artwork or artists from the platform.

208.   FKC engaged in, at least, the following wrongful conduct:

   a.   FKC submitted takedown notices and provided takedown instructions that greatly exceed the scope of any alleged trademark rights held by FKC, including fraudulent claims to names and products for which FKC has no rights.

   b.   FKC obtains an improper market advantage by stating that its artwork was designed by the famed Mexican painter Frida Kahlo.

   c.   FKC takes down artists' work (like Ms. Melo's) in order to force said artist into the Frida Kahlo FanMerch program;

   d.   FKC submits takedown notices and instructions knowing that Ms. Melo's artwork could be permanently banned from these platforms; and

   e.   In an attempt to cover product categories for which it has no rights, FKC submits foreign trademarks in support of its takedowns.

209.   By engaging in this conduct, FKC understood that Ms. Melo would suffer financial harm in the form of lost sales and could be removed from the platforms permanently.

210.   Ms. Melo was in fact financially impacted by FKC's improper conduct, including having all of her work removed on Zazzle and her work no longer surfacing on the platform's search engines even when her work has been restored (Redbubble).   Further, because Ms. Melo has less product offerings due to FKC's takedowns, Ms. Melo's work surfaces less frequently

when customers search for Frida Kahlo memorabilia due to the platforms algorithms.

211.    Indeed, because of FKC's conduct complained of herein, the majority of Ms. Melo's income from her work that honors Frida Kahlo has been eliminated.

## COUNT VII:

## UNFAIR COMPETITION (CAL. BUS. & PROF.CODE § 17200 *et seq.*)

212.    Paragraphs 1-211 are incorporated by reference herein.

213.    Ms. Melo has been injured by FKC's unfair competitive practices, including lost sales and income.

214.    FKC's conduct threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

215.    For example, FKC's directives to Zazzle (e.g., take down all products that are described as "Frida Kahlo [product]") has resulted a complete absence of competition on Zazzle; *i.e.*, all (or nearly all) products on Zazzle honoring Frida Kahlo are either now sold by FKC or are sold as part of FKC's Fanmerch program.[5]

216.    Further, FKC's fraudulent representation that its own merchandise was designed by the famed Mexican painter confers an unfair market advantage.

217.    All told, FKC has misrepresented the scope of its intellectual property rights to platforms such as Zazzle and Redbubble, thereby "competing" with Ms. Melo and other artists, including California artists, not by creating a better product or lowering its prices, but by using its fraudulent representations to unfairly preclude artists from selling their artwork.

---

[5] The undersigned has not reviewed all, roughly, 2000 Frida Kahlo products on Zazzle, but has done a random sampling of the offerings, including viewing at least 50 offerings at random, and all are either offered by FKC or are part of the Fanmerch program.

**COUNT VIII:**

**UNLAWFUL COMPETITION (CAL. BUS. & PROF.CODE § 17200 *et seq.*)**

218.     Paragraphs 1-217 are incorporated by reference herein.

219.     The predicate law for the unlawful competition prong is fraud upon the USPTO.

220.     A second predicate law is common law fraud in FKC's misrepresentations as to the scope of its intellectual property rights.

221.     FKC has engaged in unlawful trade practices.

222.     Specifically, FKC submitted false trademark takedowns to platforms claiming that Ms. Melo's non-infringing use was in fact infringing.

223.     Further, FKC represented to platforms that it owns rights that it does not in fact own.

224.     The result is that none of Ms. Melo's Frida Kahlo artwork is currently being offered on Zazzle, resulting in lost sales and lost income.

### The Effect on California and Californians

225.     These unlawful and unfair trade practices (Counts VII-VIII) significantly impact the artists, and the public as actual or potential consumers.

226.     A good faith estimate as to the impact on California proceeds as follows:

a.     A search for "Frida Kahlo" on Etsy results in more than twenty thousand (20,000) pieces.

b.     As of December 31, 2018, Etsy had 39.4 million active buyers, 2.1 million active sellers, and over 60 million items for sale.

c.     Sixty-two percent (62%) of Etsy sellers are in the United States

d.     And fourteen percent (14%) of US Etsy sellers are in California.

e.     Thus almost 10% (8.9%) of all Etsy sellers are in California, more than any other

place in the world.

    f.   In 2018 alone, Etsy executed 27,023 properly submitted takedown notices, removing or disabling access to 404,640 listings from 91,381 sellers, and closed 6,775 shops for repeat infringement.

        i.   Thus, in 2018 alone, approximately 8,000 California sellers received takedowns from Etsy alone.

    g.   In 2018 alone, Etsy's annual gross merchandise sales volume (GMV) amounted to 3.93 billion U.S. dollars; ***Californians were responsible for around 300 million of that revenue***.

    h.   Given the popularity of Frida Kahlo merchandise, given FKC's aggressive take down tactics, and given that California contains the largest number of Etsy sellers, it stands to reason that a substantial number of California residents are being affected by FKC's illegal takedown notices.

227.   A second method for estimating the effect of FKC's improper tactics on California looks to the restraints placed upon the First Amendment rights of Californians.

    a.   There is no question that Frida Kahlo is important to California.

    b.   The Galería de la Raza in San Francisco is believed to have been the impetus for Frida Kahlo's centrality to the Chicano, feminist, and socials movements of the 1970's.

    c.   California streets are named after her.

    d.   Both the SF MOMA and the De Young have done (and will do in March 2020), major showings of her work and her life/belongings.

    e.   Frida lived in San Francisco twice in her life, in 1930 and 1940.

    f.   Street artists paint her in every major California city.

g.   And hundreds if not thousands of California artists create work to honor Frida

Kahlo.

228.   Artists like Ms. Melo create work honoring Frida Kahlo because of who Frida

Kahlo was and is to these artists; because of what Frida Kahlo represents, to artists, to Mexicans,

to LGBTQ persons, and to persons with disabilities, to name a few.

229.   Indeed, as Professor Pankl points out in her article, "Made in Her Image: Frida

Kahlo as Material Culture," Frida Kahlo is herself part of the fabric of our culture:

Kahlo dramatically and overtly utilized the material culture of Mexico and other lands in
her work and image. This mélange of Kahlo and material culture began to be bandied about
the globe freely and ardently within a mere two decades after her death. Critics often
speculate on how Kahlo would have reacted to this adoration – some claiming she would
have been disgusted and others asserting her potential delight at the ironic humor of the
situation. Peter Schjeldahl cuts through the division of differing viewpoints with the bluntly
honest statement, "There are so many ways to be interested in Frida Kahlo" (2007).
Schjeldahl's point, it seems, is to dismantle the hierarchy of how best to study and/or
appreciate Kahlo. Instead, Schjeldahl suggests that it is the variety and diversity of
appreciation and/or appropriation that makes Kahlo distinctive. Thus, although many critics
are dismayed by the ways in which Kahlo's Mexicanness and personal tragedy have been
commodified (Baddeley 1991; Lindauer 1999; Zarzycka 2006), **Schjeldahl's approach
embeds that commodification as part of a serious appreciation of Kahlo**.

This provides room for assertions such as Teresa Condé's (1997) that Kahlo's enduring
value to material culture is in her painting and not in the fact that she and/or her work grace
tote bags and other cheap collectables. Indeed, Joan Borsa is adamant that Kahlo's work
(which is continually globally commodified) informs and even disrupts a number of
culturally and politically relevant issues, including: "the intersection of art and politics,
strategies of resistance, the significance of colonial discourse and the practice and process
of negotiating critical subjectivity in an attempt to 'deconstruct' and 'reconstruct' our own
histories" (1990, 38). Borsa, therefore, places a high value on how Kahlo is understood
now and rejects the trivializing of Kahlo's oeuvre simply because she stands as a popular
icon throughout the world.

230.   Materially, historian Teresa Del Conde noted the proliferation of Frida Kahlo

memorabilia in 1997, years before FKC was formed.

231.   Regardless, when artists like Ms. Melo create art honoring Frida Kahlo, they join in

the global dialogue about the identity(s) of Frida Kahlo, and our own identities as reflected through

her.

232.     No corporation has a right to employ the relatively recent and immensely flawed intellectual property takedown system(s) to control the dialogue around Frida Kahlo, dialogue protected by the First Amendment.

233.     Further, because the takedown system functions as a system of extra-judicial injunctions it is critical that the speech FKC targets has at least as much protection as speech targeted by any request for injunctive relief.  Ordinarily someone seeking to enjoin speech would need to properly plead and then prove that the targeted speech was indeed actionable.  Under present practice, however, senders of takedown notices have not needed to overcome these sorts of hurdles prior to effecting the removal of targeted content via their takedown demands.

234.     A significant reason FKC has been able to evade these constitutional requirements is because there is no effective consequence for sending non-meritorious takedown demands.

235.     FKC is improperly using the platform takedown system(s) to impede on the First Amendment rights of Californians.

236.     A third method for calculating the effect of FKC's improper takedowns is to look at the effect on the platforms themselves (many of which are California companies):

    a.  Platforms may be in fact likely are aware that FKC is vastly exceeding its legal authority in issuing its takedowns.

    b.  But, as several platforms explained to Congress:

        i.  "many [platforms] are wary of allowing challenges to trademark-related takedown requests in order to avoid being drawn into costly litigation. The result is that a trademark claim - even one built on a weak foundation – can effectively and permanently quash the speech and economic activity of others."

ii.   "Rightsholders [like FKC] have little incentive to respond to or even acknowledge users [like Ms. Melo] who dispute an infringement claim outside of a statutory safe harbor [provided for copyright but not trademark disputes]. While Section 512's [copyright] counter notice provision allows a user to repost the content if the rightsholder fails to seek a court order against the user within a period of time - which often incents the parties to resolve the issue without getting the courts involved- rightsholders can simply file repeat notices of combination [] infringement against users who dare to repost the content at issue. ***This puts pressure on [platforms] to terminate services to users*** lest the rightsholder sue the [platforms] for not implementing a reasonable ***repeat infringer policy***." (emphasis added.)

iii.  "[Platforms] often receive such a high volume of infringement complaints that they must make quick decisions based on limited information in the best interest of the company. Many [platforms] are not equipped to conduct extensive research or make complex legal decisions for a David user against the Goliath rightsholder. Simply put, especially in edge cases, [platforms often err on the side of removing content. Combined with the lack of opportunity for a user to challenge content removed due to trademark claims, the balance tips heavily in favor of purported rightsholders."

iv.   "Further, these assertions of rights can have the long-term impact of undermining public respect for and confidence in intellectual property enforcement by driving attention to stories of abusive and absurd actions by irresponsible rightsholders, powerless users, and risk-averse [platforms]. Ironically, users can easily disseminate their poor experiences by

broadcasting them all over the internet. Proper enforcement can only occur in an environment of public respect for intellectual property. A steady stream of examples of abuse can reduce the legitimacy of rightsholders as a whole in the eyes of the public, thus reducing public support for enforcement even in legitimate cases of infringement."

c. Indeed, as explained by Berkeley law professor Sonia Katyal, because of secondary liability concerns and the lack of a safe harbor when it comes to trademark claims, "platforms are extremely reluctant to ignore the trademark claims, even where the platform may believe the user had a good argument for non-infringement."

d. That is, with copyright takedowns, platforms have a safe harbor, 17 U.S.C. § 512(i)(1)(A).  But there is no codified safe harbor when it comes to trademarks, so platforms often have a much more aggressive (and unfair) takedown and repeat infringer stances.

e. Each of the platforms must hire extensive teams to execute on FKC and other alleged rights holders takedowns.  And while the teams are handling illegitimate takedowns, their ability to execute upon legitimate grievances is diminished.

f. At least the following platforms are either incorporated or have principal places of business in California: eBay, Zazzle, Etsy, Redbubble, Shopify, and Printful.

237.   Ms. Melo seeks an injunction, narrowly tailored, to end the harms to California artists, consumers, and employers caused by FKC's improper takedowns.

238.   Ms. Melo seeks restitution to the extent allowable, reasonable attorneys' fees pursuant to C.C.P. §1021.5, costs and expenses, and all other remedies permitted by law.

## COUNT IX:

## CANCELATION DUE TO ABANDONEMENT

239.    Paragraphs 1-238 are incorporated by reference herein.

240.    There is no evidence that FKC has ever sold FRIDA KAHLO branded artwork, much less continuous in commerce.

241.    And certainly not for all of the goods listed in the '902 registry.

242.    Registration No. '902, and any other registration implicated here, should be canceled as abandoned.

### JURY TRIAL DEMAND

Ms. Melo requests a trial by a jury of her peers.

### PRAYER FOR RELIEF

Ms. Melo seeks an Order(s):

    i.    finding that Ms. Melo's artwork does not infringe the registration(s) at-issue;

    ii.    mandating that FKC provide to all platforms a rescission of its takedown notices;

    iii.    an injunction narrowly tailored to the harms at-issue;

    iv.    Canceling all registrations in the 2007 assignment, and all registrations based thereon;

    v.    cancelling any registrations at-issue here;

    vi.    mandating damages for all financial harms suffered by Ms. Melo, including loss of revenue; and

    vii.    awarding Ms. Melo her attorney's fees and costs.


Respectfully submitted,


*Rachael D. Lamkin*
Rachael D. Lamkin

*Attorneys for DJ Plaintiff*
*Cristine Melo*

**CERTIFICATE OF SERVICE**

On this day, February 18, 2020, I did personally served Defendants by filing the following documents with the Court's ECF system:

**SECOND AMENDED COMPLAINT**

**RED LINE THEREOF**

*Rachael D. Lamkin*
_____
Rachael D. Lamkin

*Attorneys for DJ Plaintiff*
*Cristine Melo*